IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JAMES A. FROHNER, | : | HON. JEROME B. SIMANDLE |
| Plaintiff, | : | Civil No. 07-1174 (JBS) |
| v. | : | |
| CITY OF WILDWOOD, et al., | : | **OPINION** |
| Defendants. | : | |

APPEARANCES:

Arthur J. Murray, Esq.
JACOBS & BARBONE, PA
1125 Pacific Avenue
Atlantic City, NJ 08401
      Attorney for Plaintiff James A. Frohner

James P. Savio, Esq.
LAW OFFICES OF JAMES P. SAVIO
Second Floor
1030 Atlantic Avenue
Atlantic City, NJ 08401
      Attorney for Defendants City of Wildwood, Police Chief
      Joseph Fisher, Sergeant Richard Adair, and Patrolman Joseph
      Murphy

**SIMANDLE**, District Judge:

## I.    Introduction

This dispute arises out of a series of events that took
place in 2005 during the "Roar to the Shore Weekend," an annual
motorcycle convention based in Wildwood, New Jersey.  Plaintiff
James A. Frohner was working as an undercover agent for the
Federal Bureau of Investigation ("FBI") at the Roar to the Shore
Weekend in September 2005.  On September 9, 2005, the individual
Defendants, all of whom work for the Wildwood Police Department,

began to suspect that Plaintiff was a motorcyclist impersonating an FBI agent, rather than an FBI agent disguised as a motorcyclist, and arrested Plaintiff.  Plaintiff was released once the Defendants verified his credentials, but he alleges that he was injured as a result of Defendants' conduct during the arrest.  Plaintiff filed suit, alleging that Defendants had violated his rights under federal and state law.

Presently before the Court are Defendants' motion for summary judgment [Docket Item 18] and Plaintiff's cross-motion for partial summary judgment [Docket Item 23].  For the reasons set forth below, the Court will grant in part and deny in part Defendants' motion, and will deny Plaintiff's cross-motion.

## II.  BACKGROUND

### A.  Facts

The Roar to the Shore Weekend is an annual motorcycle convention that takes place in Wildwood, New Jersey.  (Frohner Dep. at 18.)  Among the regular attendees at the Roar to the Shore Weekend are members of various motorcycle gangs, including the Hell's Angels and the Pagans.  (Id.)  Because of the regular presence of gang members at the event, the Roar to the Shore Weekend attracts to Wildwood not only motorcycle enthusiasts, but members of various law enforcement agencies as well, including employees of the Wildwood Police Department, the Cape May County Prosecutor's Office, the Atlantic County Prosecutor's Office, the

New Jersey State Police, the Philadelphia Police Department, and the FBI.  (Id. at 19-20.)  In order to help detect and deter illegal activity at the event, some of these agencies send undercover officers dressed as motorcyclists.  (Fisher Dep. at 31-32.)

Plaintiff was working in such an undercover capacity on September 9, 2005.  (Frohner Dep. at 21.)  Plaintiff, who had previously worked as a police officer for the Egg Harbor Township Police Department, began to work for the FBI's South Jersey Violent Crimes, Gangs and Guns Drug Task Force in 2002.  (Id. at 16-17.)  In September 2005, he was assigned to attend the Roar to the Shore Weekend while undercover.  (Id. at 20.)  On September 9, 2005, in order to blend in with the crowd, Plaintiff was wearing "jeans . . . , a multicolored shirt, [and] ratty sneakers," and had grown "a full goatee and a mustache."  (Id.)  Plaintiff also wore a band-aid across his nose.  (Id. at 20-21.)  He carried his FBI identification on his person and had his Egg Harbor Township Police Department identification in his vehicle.  (Id.)

At approximately 4:30 p.m., Plaintiff was mingling with the crowd and walking south along Atlantic Avenue in Wildwood when he observed two people whom he suspected were members of the Pagans gang traveling in the opposite direction.  (Pl.'s Br. Ex. C at 1.)  Using his cellular telephone, Plaintiff contacted Sergeant

3

Rick Foote of the New Jersey State Police to relay information about the suspected gang members. (Id.)  A man on the street who overheard Plaintiff's telephone conversation about these Pagan gang members approached Plaintiff and, in a loud voice, accused Plaintiff of being a "cop." (Id. at 2.)  Plaintiff denied this accusation, to which the man responded that Plaintiff must instead have been a member of the Hell's Angels sent to spy on the Pagans. (Id.)  The man then brandished a knife, told Plaintiff that he "had no business being on Pagan territory," shouted obscenities at Plaintiff, and walked away. (Id.)

Seeking to avoid having to disclose his identity to the man who had accosted him, Plaintiff immediately approached two uniformed Wildwood police officers who had observed some of the encounter – Officers Sullivan and Castro, (Defs.' Br. Ex. F at 1), who are not Defendants herein – and informed them that he was working undercover for the FBI. (Pl.'s Br. Ex. C at 2.) Plaintiff also produced his FBI credentials for Officers Sullivan and Castro. (Id.)  Plaintiff described his encounter with the knife-carrying man to the police officers, informed them that he did not wish to reveal to the man (whom he suspected was a member of the Pagans) that he was an undercover FBI agent, and asked the officers if they would assist him in identifying the man. (Id.) Officers Sullivan and Castro stated that they would attempt to identify the man, and Plaintiff departed the scene to avoid

another similar encounter.  (Id.)  After their discussion with Plaintiff, Officers Sullivan and Castro contacted another Wildwood police officer, Patrolman David Romeo, and described their conversation with Plaintiff.  (Defs.' Br. Ex. F at 1.) Patrolman Romeo began to search the crowd for the Pagan gang member.  (Id.)

Approximately an hour later, Plaintiff returned to the location where Officers Sullivan and Castro were stationed to find out if they had any information about the man who had displayed the knife, and Officers Sullivan and Castro summoned Patrolman Romeo.  (Id.)  Patrolman Romeo, who had not located the gang member, arrived at the officers' station and observed Officers Sullivan and Castro speaking with Plaintiff.  (Id.) Romeo recognized Plaintiff because earlier that evening, Plaintiff had approached Romeo and asked him if he knew Patrolwoman Vaino, who had worked at the Roar to the Shore Weekend the previous year but who had since moved away; Patrolman Romeo's only contact with Plaintiff earlier that evening had been to tell Plaintiff that Patrolwoman Vaino had moved to the South. (Id.)

Upon seeing Plaintiff speaking with Officers Sullivan and Castro, Patrolman Romeo asked to see Plaintiff's FBI credentials, which Plaintiff produced for inspection.  (Id.)  Patrolman Romeo, who was not certain whether the credentials were authentic or

falsified, asked Plaintiff to describe his encounter with the
Pagan gang member.  (Id.)  Plaintiff recounted his encounter with
the knife-carrying man, including the fact that the man had
initially overheard Plaintiff speaking on the phone with the New
Jersey State Police.  (Id.)  Romeo explained to Plaintiff that
they had been unable to locate the Pagan gang member, but stated
that he would continue to search the area.  (Id.)

    As Patrolman Romeo indicated in the report he prepared the
following day, he began to harbor doubts about whether Plaintiff
was, in fact, an FBI agent.[1]  (Id. at 2.)  To test the
authenticity of Plaintiff's story, Patrolman Romeo sought out the
Tactical Patrol Unit of the New Jersey State Police in order "to
confirm the story that the agent gave to [him] about [having
been] talking to the State Police" when the Pagan gang member
confronted him.  (Id.)  Patrolman Romeo spoke with State Police
Trooper Hibschman, who "stated . . . that no one contacted him
from the FBI or any other Troopers that were with him about
watching a subject."  (Id.)  Apprised of Romeo's suspicions,
Defendant Police Chief Fisher, who was present during the
conversation between Romeo and Hibschman, instructed Romeo to
"attempt to locate the agent and verify his identity through the

_____

    [1]  In particular, Romeo doubted that an undercover agent
"would approach . . . officers . . . in full uniform on at least
three occasions if he was an undercover officer working the
event, [rather than] . . . approach[ing] a supervisor or go[ing]
to the mobile command center."  (Defs.' Br. Ex. F at 2.)

mobile command center."[2]   (Id.)   Romeo then contacted the
Wildwood police officers in the immediate area, including
Defendant Murphy, to inform them that "the chief wanted the
gentleman stopped . . . to verify who he was and the validity of
his credentials."  (Murphy Dep. at 35.)  According to Defendant
Murphy, Romeo indicated that he was "suspicious as to whether or
not [Plaintiff] was a legitimate law enforcement officer."  (Id.
at 34.)

    By this point, Plaintiff and his supervisor had determined
that it would be best for him to leave the rally in order to
avoid jeopardizing his ability to remain undercover.  (Pl.'s Br.
Ex. C at 3.)  Plaintiff located his government-issued unmarked
vehicle and began to drive away along Atlantic Avenue.  (Id. at
4.)  While Plaintiff was stopped at a red light, Defendant Murray
recognized him based on the description from Romeo,[3] and
approached Plaintiff's car along with two other police officers.[4]

---

    [2]  As Defendant Fisher explained during his deposition, he
instructed Patrolman Romeo to run Plaintiff's credentials through
the command center because "the procedure was everybody [in law
enforcement] was supposed to check into the command post, and
they would know whether he was there on the scene or not."
(Fisher Dep. at 70.)

    [3]  According to Defendant Murphy, Plaintiff was easily
identifiable on account of the band-aid on his nose.  (Murphy
Dep. at 38.)

    [4]  Defendant Murphy contends that he approached Plaintiff's
car alone and that other officers arrived at a subsequent time.
For purposes of deciding Defendants' summary judgment motion, the
Court credits Plaintiff's testimony on this matter.  See Hunt v.

(Id.; Murphy Dep. at 38.)

Defendant Murphy approached the driver's side window and asked Plaintiff to produce his identification and credentials for inspection. (Frohner Dep. at 39.) Plaintiff, who kept his credentials in the door pocket of the driver's side door when driving, (Pl.'s Br. Ex. C at 4), began to reach down to retrieve his credentials. (Frohner Dep. at 39.) As Plaintiff was reaching down, Defendant Murphy shouted at Plaintiff, "keep your hands where I can see them." (Id. at 39-40.) Plaintiff, "[n]ot immediately understanding what was transpiring," continued to reach for his credentials in the door pocket, which prompted Defendant Murphy, who by this time had drawn his firearm, to again shout to Plaintiff to keep his hands in view. (Id. at 39-42.) Plaintiff complied with Defendant Murphy's second order and ceased reaching down to the door pocket. (Id. at 40.) Defendants Murphy and Adair and another unnamed officer then removed Plaintiff from his vehicle, put handcuffs on Plaintiff, and patted him down, at which point they removed the firearm Plaintiff kept at his ankle. (Id. at 42-46.) According to Plaintiff, as a result of the officers aggressively twisting his wrist and/or failing to "double lock" the handcuffs when applying them, Plaintiff's right wrist was seriously injured during the

---

Cromartie, 526 U.S. 541, 552 (1999).

arrest.[5]  (Id. at 46-48.)  The arresting officers refused to
loosen the handcuffs, notwithstanding Plaintiff's protests that
they were too tight and were injuring his wrists.  (Pl.'s Br. Ex.
C at 6.)  Plaintiff did not struggle while the officers attempted
to handcuff him.  (Frohner Dep. at 46.)

Once Plaintiff had been removed from the car, Defendant
Fisher, who had arrived at the scene at some point during the
arrest, removed Plaintiff's credentials from the side door
pocket.  (Fisher Dep. at 75.)  In addition, after Plaintiff had
been removed from the vehicle and placed under arrest but while
the vehicle was still stopped in the middle of Atlantic Avenue,
Defendant Murphy opened the center console in Plaintiff's
automobile, observed magazine clips of firearm ammunition, and
seized the ammunition.[6]  (Murphy Dep. at 56; Frohner Dep. at 13.)
Defendant Fisher then instructed Defendant Murphy to move
Plaintiff's vehicle from the road and to park and lock the
vehicle, which Defendant Murphy did.  (Murphy Dep. at 54.)

_____

    [5]  Double locking "prevent[s] the handcuffs from tightening
as a result of someone pulling on the handcuffs."  (Frohner Dep.
at 48.)

    [6]  Defendant Murphy contends that the ammunition was in
plain view at Plaintiff's feet during the arrest and that he
accordingly did not need to open the console to view or seize the
ammunition.  (Murphy Dep. at 56.)  As the non-moving party's
evidence must be believed in the context of a summary judgment
motion, the Court credits Plaintiff's testimony for purposes of
Defendants' motion for summary judgment, and Murphy's testimony
for purposes of Plaintiff's motion for summary judgment.

Defendant Murphy and an officer named Patrolman McCarthy then transported Plaintiff to the police station in a police vehicle that had been called to the scene.  (Id. at 59-60.) Defendant Fisher brought Plaintiff's credentials to the mobile command center, where he verified that Plaintiff was, indeed, an FBI agent.  (Fisher Dep. at 76-77.)  Plaintiff was released and driven to his vehicle shortly thereafter, once Defendant Fisher had verified the authenticity of Plaintiff's credentials and that Plaintiff was the person authorized to possess the credentials. (Pl.'s Br. Ex. C at 7-8.)

Following his arrest on September 9, 2005, Plaintiff has experienced pain and numbness in his right wrist and has had two surgeries to address these symptoms.  (Frohner Dep. at 68.)  He attributes these injuries to the force the officers used in seizing him and the inappropriately tight manner of applying the handcuffs to Plaintiff that evening.  (Id. at 42.)  Finally, Plaintiff testified during his deposition that he did not believe that any of Defendants' conduct was motivated by personal malice. (Id. at 67.)

**B.   Procedural History**

On February 8, 2007, Plaintiff filed a Complaint in the Superior Court of New Jersey naming the City of Wildwood (the "City"), Fisher, and numerous John Doe officers as Defendants [Docket Item 1].  Defendants removed the matter to this Court on

10

March 12, 2007.  Plaintiff filed an Amended Complaint naming
Murphy and Adair as Defendants on June 29, 2007 [Docket Item 7].
In his Amended Complaint, Plaintiff asserts claims of false
arrest, assault, and battery under New Jersey common law (Court
I); claims premised upon Defendants' alleged violation of
Plaintiff's due process rights, his right to be free from
unlawful searches and seizures, and his right to be free from
cruel and unusual punishment under the United States Constitution
(Count II); a claim against the City for its failure to
adequately screen and/or train its employees (Count III); and a
claim against the City for instituting an unlawful policy or
custom that resulted in his injuries (Count IV).

       After a period of discovery, the parties filed the cross-
motions for summary judgment presently under consideration, to
the merits of which the Court now turns.

## III. DISCUSSION

### A.    Standard of Review

       Summary judgment is appropriate when the materials of record
"show that there is no genuine issue as to any material fact and
that the moving party is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(c).  In deciding whether there is a
disputed issue of material fact, the court must view the evidence
in favor of the non-moving party by extending any reasonable
favorable inference to that party; in other words, "the nonmoving

11

party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

Although entitled to the benefit of all justifiable inferences from the evidence, "the nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth 'specific facts showing that there is a genuine issue for trial,' else summary judgment, 'if appropriate,' will be entered." United States v. Premises Known as 717 South Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e)) (citations omitted).  As the Supreme Court has explained,

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986) (internal quotations and citations omitted).

The standard by which the Court decides a summary judgment motion does not change when, as here, the parties file cross-motions.  <u>Weissman v. United States Postal Serv.</u>, 19 F. Supp. 2d 254, 259 (D.N.J. 1998).  When ruling on cross-motions for summary judgment, the court must consider the motions independently, <u>Williams v. Philadelphia House Auth.</u>, 834 F. Supp. 794, 797 (E.D. Pa. 1993), <u>aff'd</u>, 27 F.3d 560 (3d Cir. 1994), and view the evidence on each motion in the light most favorable to the party opposing the motion.  <u>See Matsushita Elec. Indus. Co., Ltd.  v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

**B.   Claims Asserted Against Individual Defendants**

**1.   <u>False Arrest Claims</u>**

The Court first addresses the Individual Defendants' argument that they are entitled to summary judgment as to Plaintiff's Fourth Amendment and New Jersey state law claims for false arrest.  Defendants argue that although the officers' suspicions that Plaintiff was not a law enforcement officer turned out to have been incorrect, they had probable cause to believe that Plaintiff was impersonating a law enforcement officer in violation of N.J.S.A. 2C:28-8(b).[7]  For the reasons

---

[7]  Section 2C:28-8(b) provides:

A person commits a crime of the fourth degree if he

explained below, the will deny Defendants' motion for summary judgment as to these claims.[8]

a. <u>Qualified Immunity Standard</u>

As an "accommodation of competing values," qualified immunity strikes a balance by permitting a plaintiff to recover for constitutional violations where the defendant officer was "plainly incompetent or . . . knowingly violate[d] the law," while immunizing an officer who "made a reasonable mistake about the legal constraints on his actions." <u>Curley v. Klem</u>, 499 F.3d 199, 206-07 (3d Cir. 2007) (internal quotations and citations omitted). In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court described the two-step inquiry courts undertake in

_____

falsely pretends to hold a position as an officer or member or employee or agent of any organization or association of law enforcement officers with purpose to induce another to submit to such pretended official authority or otherwise to act in reliance upon that pretense.

N.J.S.A. 2C:28-8(b).

[8] The Individual Defendants' assertion of qualified immunity from Plaintiff's Fourth Amendment claim would not shield them from liability from Plaintiff's state law claim for false arrest. <u>See</u> <u>Miller v. New Jersey</u>, 144 Fed. Appx. 926, 929 (3d Cir. 2005) (noting that "qualified immunity is inapplicable to a state law cause of action") (citing <u>Rodriguez v. Torres</u>, 60 F. Supp. 2d 334, 354 (D.N.J. 1999)). While public employees in New Jersey enjoy a good faith immunity which is "analyzed under an identical standard as that for federal law's qualified immunity," <u>Gilbert v. Camden City</u>, No. 04-3268, 2007 WL 1040978, at *8 (D.N.J. Apr. 4, 2007), good faith immunity does not "exonerate a public employee from liability for false arrest or false imprisonment." N.J.S.A. 59:3-3.

determining whether a governmental officer is entitled to qualified immunity.  First, the Court must address whether "the officer's conduct violated a constitutional right." Id. at 201. As the Court of Appeals noted in Curley, the first step of the analysis is "not a question of immunity at all, but is instead the underlying question of whether there is even a wrong to be addressed in an analysis of immunity." Curley, 499 F.3d at 207. If in this first step the Court finds that there was no constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.

"If, and only if, the court finds a violation of a constitutional right, the court moves to the second step of the analysis and asks whether immunity should nevertheless shield the officer from liability." Curley, 499 F.3d at 207 (quoting Scott v. Harris, --- U.S. ----, 127 S. Ct. 1769, 1774 (2007)).  In the second step of the analysis, the Court addresses "whether the right that was violated was clearly established, or, in other words, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id. (quoting Saucier, 533 U.S. at 202).

Where, as here, the reasonableness of the officer's conduct turns on whether or not he had probable cause to arrest a suspect, "a police officer is entitled to qualified immunity

15

unless it would have been clear to a reasonable officer there was no probable cause to arrest." Gilles v. Davis, 427 F.3d 197, 205 (3d Cir. 2005). Put differently, "whether there was any reasonable basis to suppose there was probable cause . . . is the test for qualified immunity." Id. (quoting Kijonka v. Seitzinger, 363 F.3d 645, 648 (7th Cir. 2004)); see also Walczyk v. Rio, 496 F.3d 139, 163 (2d Cir. 2007) (explaining that "[d]espite . . . [the fact] that the search . . . was not supported by probable cause, defendants might still be entitled to claim qualified immunity from liability for damages if the search was supported by 'arguable probable cause'") (citation omitted).

    b.  Probable Cause and Arguable Probable Cause to
        Arrest

    Under the first step of this analysis, Defendants do not appear to contest that they subjected Plaintiff to a "seizure" within the meaning of the Fourth Amendment, and so the Court's analysis of whether Plaintiff has stated a valid false arrest claim turns on whether the seizure was reasonable. See Berg v. County of Allegheny, 219 F.3d 261, 269 (3d Cir. 2000). "A warrantless arrest of an individual in a public place for a felony . . . is consistent with the Fourth Amendment if the arrest is supported by probable cause." Maryland v. Pringle, 540 U.S. 366, 370 (2003). The Individual Defendants are accordingly entitled to summary judgment as to Plaintiff's false arrest

16

claims if they had probable cause to believe that he was
impersonating a law enforcement officer in violation of N.J.S.A.
2C:28-8(b).  As the following discussion makes clear, the Court
concludes that matter of probable cause presents a jury question
in this case.

As the Court of Appeals has explained, "[p]robable cause
means facts and circumstances that are sufficient to warrant a
prudent person, or one of reasonable caution, in believing, in
the circumstances shown, that the suspect has committed, is
committing, or is about to commit an offense." Camiolo v. State
Farm Fire and Cas. Co., 334 F.3d 345, 363 (3d Cir. 2003)
(internal quotations and citations omitted).  In other words,
"[s]o long as the totality of the circumstances, viewed in a
common sense manner, reveals a probability or substantial chance
of criminal activity on the suspect's part, probable cause
exists." United States v. Mounts, 248 F.3d 712, 715 (7th Cir.
2001) (citation omitted).

Defendants argue that the totality of the circumstances
herein would lead a reasonable officer to conclude (albeit
incorrectly) that Plaintiff was impersonating an FBI agent in
violation of New Jersey law.  Defendants focus most strenuously
upon Patrolman Romeo's efforts to verify Plaintiff's story that
he had been on the phone with the New Jersey State Police when he
first accosted by the Pagan gang member; according to Defendants,

17

once Romeo spoke to a member of the New Jersey State Police who had not himself spoken to an FBI agent on the phone, the Defendants had probable cause to believe that Plaintiff was impersonating an FBI agent in violation of N.J.S.A. 2C:28-8(b).

The Court cannot so conclude as a matter of law.  The Court of Appeals has stated on numerous occasions that the question of "probable cause in a section 1983 damage suit is one for the jury."  Montgomery v. De Simone, 159 F.3d 120, 124 (3d Cir. 1998).  In this case, while Patrolman Romeo's conversation with Trooper Hibschman may have lent some degree of support to Defendants' suspicion that Plaintiff was impersonating an FBI agent,[9] it is by no means apparent as a matter of law that this conversation alone demonstrated a "substantial chance of criminal activity on the suspect's part."  Mounts, 248 F.3d at 715 (emphasis added).  First, Plaintiff showed Patrolman Romeo and other Wildwood police officers his valid FBI credentials, which undercuts the reasonableness of Defendants' suspicions that Plaintiff was engaging in unlawful impersonation.  Moreover, as is now apparent, Plaintiff did speak on the telephone with a member of the New Jersey State Police – he simply spoke with a

---

[9]  While Patrolman Romeo is not a Defendant in this action, "[t]he legality of a seizure based solely on statements issued by fellow officers depends on whether the officers who issued the statements possessed the requisite basis to seize the suspect." Rogers v. Powell, 120 F.3d 446, 453 (3d Cir. 1997) (emphasis in original).

different officer (Sergeant Foote) than Patrolman Romeo contacted.  The reasonableness of Patrolman Romeo's efforts to verify Plaintiff's status as a law enforcement officer, and whether those efforts gave Defendants probable cause to believe (again, incorrectly) that Plaintiff was engaged in criminal activity, despite Special Agent Frohner producing his valid FBI credentials, is a jury question in this case.[10]

Nor can the Court conclude, at the second step of the qualified immunity analysis, that the Individual Defendants are entitled to qualified immunity under the more forgiving "arguable probable cause" standard.  Walczyk v. Rio, 496 F.3d at 163.  The facts upon which Defendants rely in arguing that there was probable cause to arrest Plaintiff themselves raise factual questions as to "whether there was any reasonable basis to suppose there was probable cause," which precludes the entry of summary judgment on this record.  Gilles, 427 F.3d at 205

---

[10]  The Court likewise is not persuaded by Defendants' suggestion that they had probable cause to believe that Plaintiff was violating N.J.S.A. 2C:28-8(b) because when Defendant Murphy ordered Plaintiff to keep his hands in the air, Plaintiff continued to reach for his credentials.  While a police officer who has a reasonable suspicion that a suspect is dangerous may conduct a pat-down of the suspect and the passenger compartment of his vehicle, see Michigan v. Long, 463 U.S. 1032, 1050 (1983), such suspicion alone does not give rise to probable cause to arrest.  Defendant Murphy's (incorrect) belief that Plaintiff was reaching for a weapon rather than his credentials would at most permit Defendant Murphy to have performed a Long-type search; in itself, it did not give rise to a "probability or substantial chance" that Plaintiff was impersonating an FBI agent in violation of N.J.S.A. 2C:28-8(b).  Mounts, 248 F.3d at 715.

(citation omitted).  In particular, while Patrolman Romeo doubted
that an undercover agent "would approach . . . officers . . . in
full uniform on at least three occasions if he was an undercover
officer working the event, [rather than] . . . approach[ing] a
supervisor or go[ing] to the mobile command center," (Defs.' Br.
Ex. F at 2), the record herein is insufficient for the Court to
conclude that such doubts were reasonable as a matter of law; for
example, the record is silent as to how undercover FBI agents
normally conduct themselves.  A more likely inference from these
facts is that an undercover agent would seek the assistance of
local officers who may have seen the same individual who was of
interest, working on the assumption that the local officers might
assist, rather than hinder, the investigation as it was underway.
Likewise, the Court cannot find as a matter of law that Patrolman
Romeo, upon speaking with Trooper Hibschman, reasonably but
incorrectly believed that Plaintiff had lied about speaking to
the New Jersey State Police.  No defendant officer even asked
Frohner to name the State Trooper he had spoken with.  While it
is now apparent that Trooper Hibschman did not possess sufficient
information regarding Plaintiff's call to Sergeant Foote to
address Patrolman Romeo's concerns, whether it was reasonable for
Romeo to have believed that Trooper Hibschman possessed such
information cannot be resolved upon the record before the Court.

In summary, the Court finds that Defendants have failed to

demonstrate as a matter of law that they had probable cause or arguable probable cause to believe that Plaintiff was impersonating an FBI agent in violation of N.J.S.A. 2C:28-8(b). Defendants' motion for summary judgment as to Plaintiff's false arrest claims under federal and New Jersey law will accordingly be denied.

        2.   Unlawful Search Claims

            a.   Defendants' Motion for Summary Judgment

    Having determined that the issues of probable cause and arguable probable cause present questions for the jury in this matter, the Individual Defendants' motion for summary judgment as to Plaintiff's claims that Defendants Murphy and Fisher conducted an unlawful search of Plaintiff's vehicle will be denied. Defendants have sought to characterize Murphy's and Fisher's search of Plaintiff's automobile as an incident to the lawful arrest of Plaintiff.  The Supreme Court has repeatedly held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." Thornton v. United States, 541 U.S. 615, 620 (2004) (quoting New York v. Belton, 453 U.S. 454, 460 (1981)) (emphasis added).  Although it would have been lawful for Defendants to arrest Plaintiff if they had probable cause to believe that he was impersonating an FBI agent, see Pringle, 540 U.S. at 370, and

21

although a contemporaneous search of the passenger compartment of Plaintiff's automobile under such circumstances would not give rise to a section 1983 Fourth Amendment claim, see Thornton, 541 U.S. at 620, the Court has already concluded that the reasonableness of Defendants' belief that Plaintiff was impersonating an FBI agent cannot be resolved upon summary judgment.  With unresolved facts precluding a determination of probable cause upon this record, the Court cannot conclude that Defendants Murphy's and Fisher's search of Plaintiff's automobile was an incident to a lawful arrest.  Nor would a reasonable officer believe that it was lawful under the Fourth Amendment to conduct a warrantless search of a suspect's vehicle when there was not probable cause to arrest the suspect in the first place.[11]  See, e.g., Thornton, 541 U.S. at 620.

---

[11]  Under the authority of Michigan v. Long, 463 U.S. 1032 (1983), an officer may "conduct a 'Terry' patdown' of the passenger compartment of a vehicle upon reasonable suspicion that an occupant is dangerous and may gain immediate control of a weapon." Knowles v. Iowa, 525 U.S. 113, 118 (1998).  As the Supreme Court explained in Long itself, though, the purpose of a Terry/Long search is distinct from that authorized in Belton and Thornton: "The sole justification of the search is the protection of police officers and others nearby."  Long, 463 U.S. at 1050 n.4 (citation omitted) (also noting that "because the interest in collecting and preserving evidence is not present in the Terry context, we require that officers who conduct area searches during investigative detentions must do so only when they have the level of suspicion [of dangerousness] identified in Terry").  By the time the search of Plaintiff's car took place, Plaintiff had been placed under arrest, was in handcuffs, and had been taken to a police vehicle; Defendants Murphy's and Fisher's post-arrest search of Plaintiff's vehicle thus cannot be justified under Long's dangerousness rationale.

22

The Court will accordingly deny Defendants' motion for summary judgment as to Plaintiff's claim that Defendants Murphy and Fisher conducted an unlawful search of Plaintiff's vehicle in violation of the Fourth Amendment.

        b.    <u>Plaintiff's Motion for Partial Summary Judgment</u>

With regard to the lawfulness of Defendants Murphy's and Fisher's search of Plaintiff's automobile, Plaintiff claims that in addition to asserting a claim for damages under section 1983, his Amended Complaint also asserts such a claim under the New Jersey constitution pursuant to the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.  Plaintiff argues that he is entitled to summary judgment on this claim.  For the following reasons, the Court finds that Plaintiff has not pleaded a New Jersey Civil Rights Act claim, and that Plaintiff's motion for summary judgment on such a claim must be denied.

The Amended Complaint contains no reference to the New Jersey Civil Rights Act and identifies no separate claim asserted thereunder.  Plaintiff does not argue to the contrary.  Instead, he draws the Court's attention to the first sentence of the Amended Complaint:

> The causes of action alleged seek to redress deprivation under color of law, policy and custom, of rights secured by the United States Constitution, and the statutory and common laws of the State of New Jersey, and to recover damages, costs, and attorneys' fees, under 42 U.S.C. § 1983, § 1985(3), § 1986, § 1988, and the statutory and common laws of the State of New Jersey.

(Am. Compl. ¶ 1.)  As Plaintiff argues, the "statutory laws of the State of New Jersey would include N.J.SA. 10:6-1, et seq., which is known as the New Jersey Civil Rights Act."  (Pl.'s Opp'n Br. at 10.)  By extension, he appears to conclude, he has adequately pleaded a Civil Rights Act claim in this action by referring, as a general matter, to the statutory laws of New Jersey.

The Court cannot agree.  A complaint must give the defendants notice of all of a plaintiff's claims.  See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993).  Contrary to Plaintiff's argument, the mere reference in the Complaint to the "statutory and common laws of the State of New Jersey" is insufficient to put Defendants on notice that he intended to assert a New Jersey Civil Rights Act claim.  Moreover, "[a] plaintiff may not amend his complaint through arguments in his brief."  Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996).  If Plaintiff seeks to file a second amended complaint asserting New Jersey Civil Rights Act claims, he may request leave to do so by motion pursuant to Rule 15(a)(2).  The Court expresses no opinion as to the viability of such a claim in the absence of a proper motion to amend.

Because Plaintiff failed to plead a claim under the New Jersey Civil Rights Act in his Amended Complaint, his motion for summary judgment on such a claim will be denied.

3.  <u>Excessive Force Claim</u>

The Court will deny Defendants' motion for summary judgment as to Plaintiff's excessive force claim.[12]  Plaintiff alleges that he was seriously injured as a result of Defendants Murphy's and Adair's conduct in removing him from his vehicle and applying handcuffs in a manner that was excessively tight.[13]  (Frohner Dep. at 46, 68.)  Plaintiff testified that he did not resist or otherwise struggle with the police as he was being removed from the vehicle and handcuffed, (<u>id.</u> at 46), and has indicated that the Individual Defendants refused to adjust the handcuffs, notwithstanding Plaintiff's complaints that the handcuffs were excessively tight and were injuring his wrists.  (Pl.'s Br. Ex. C at 6.)  Plaintiff testified that his wrists were injured as a result of the tightness of the handcuffs, as well as the manner in which Defendants Murphy and Adair twisted his wrist when

---

[12]  In addition to alleging that Defendants' alleged use of excessive force violated his Fourth Amendment rights, Plaintiff alleges that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment.  (Am. Compl. Count II, ¶ 2.)  "Because plaintiff was not imprisoned at any time during the relevant period at issue in this case, the protections of the Eighth Amendment clearly do not apply."  <u>John v. Berry</u>, 469 F. Supp. 2d 922, 932 (W.D. Wash. 2006) (citing <u>Whitley v. Albers</u>, 475 U.S. 312, 327 (1986)).

[13]  In light of the fact that Plaintiff directly attributes this conduct to Defendant Adair in his deposition testimony, (Frohner Dep. at 42), Defendants' argument that Plaintiff has failed to adduce evidence suggestive of Defendant Adair's involvement in the constitutional violations alleged herein is without merit.

extricating him from his vehicle, and indicated that he has since undergone surgery twice to address the lingering symptoms in his wrist.  (Id. at 68.)

The Fourth Amendment prohibits the use of excessive force by a law enforcement officer.  Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)).  As the Court of Appeals explained in Couden v. Duffy:

> In deciding whether challenged conduct constitutes excessive force, a court must determine the objective reasonableness of the challenged conduct, considering the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.  Other factors include the duration of the officer's action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

Couden, 446 F.3d at 496-97 (internal quotations and citations omitted).  The Court of Appeals has specifically recognized that a plaintiff who suffers serious injury as a result of "excessively tight" handcuffs when officers ignore complaints that the handcuffs are causing significant pain may establish that the officer's "use of force was excessive in violation of the Fourth Amendment."  Kopec v. Tate, 361 F.3d 772, 777 (3d Cir. 2004).

Defendants' lone argument with regard to Plaintiff's excessive force claim is that in the absence of expert testimony

regarding the proper application of handcuffs, Plaintiff's excessive force claim must fail.  Defendants have cited no authority suggesting that expert testimony on police procedures is required in an excessive use of force case, and courts have routinely held to the contrary.  See, e.g., Pena v. Leombruni, 200 F.3d 1031, 1034 (7th Cir. 1999); Buchanan v. City of Milwaukee, 290 F. Supp. 2d 954, 957 n.2 (E.D. Wis. 2003).  In light of this authority, and the Court of Appeals' recognition that the use of excessively tight handcuffs may give rise to an excessive force claim, see Kopec, 361 F.3d at 777, the Court will deny Defendants' motion for summary judgment as to Plaintiff's excessive force claim.

    4.  Punitive Damages

      The Court will likewise deny Defendants' motion for summary judgment as to Plaintiff's claim for punitive damages.[14] Defendants argue that, on account of Plaintiff's deposition testimony that he did not believe that the Individual Defendants' actions were motivated by personal enmity, (Frohner Dep. at 67), they are entitled to summary judgment as to Plaintiff's claims for punitive damages.  This argument rests upon a narrower

---

    [14]  Although not raised by Defendants, the Court recognizes that "a municipality is immune from punitive damages under 42 U.S.C. § 1983."  City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981).  Because the Court grants Defendants' motion for summary judgment as to Plaintiff's claims against the City, infra, there are no claims for punitive damages against a municipality in this case.

interpretation of the availability of punitive damages than has been recognized under section 1983 and New Jersey law. Under section 1983 and New Jersey's Punitive Damages Act, N.J.S.A. 2A:15-5.12, while a defendant who is merely negligent or grossly negligent may not be subjected to punitive damages, a defendant whose conduct demonstrates a reckless disregard toward others' rights may be subjected to punitive damages. See Smith v. Wade, 461 U.S. 30, 56 (1983) (a jury may award punitive damages when a "defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others"); see also N.J.S.A. 2A:15-5.12(a).

Thus, as the Court of Appeals has explained:

[F]or a plaintiff in a section 1983 case to qualify for a punitive award, the defendant's conduct must be, at a minimum, reckless or callous. Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard. This point is made clear by the Supreme Court's language in Wade: "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Id. at 56 (emphasis added).

Savarese v. Agriss, 883 F.2d 1194, 1204 (3d Cir. 1989); see also Kounelis v. Sherrer, 529 F. Supp. 2d 503, 534 (D.N.J. 2008).

In this case, the Court finds that the issue of whether any of the Individual Defendants were recklessly indifferent to

28

Plaintiff's rights presents a jury question.  See Kounelis, 529
F. Supp. 2d at 534.  A jury could find that Defendants' refusal
to adjust Plaintiff's handcuffs, in the face of Plaintiff's
statements that the handcuffs were too tight and were injuring
his wrists and in light of the fact that Plaintiff was not
struggling, demonstrated a reckless indifference toward
Plaintiff's rights.  Should the jury find that the Defendants
lacked probable cause to arrest or search Plaintiff, and that
they engaged in the seizure and use of force in question rashly
and with a disregard for the limitations the Fourth Amendment
imposes upon searches and seizures, the jury could impose
punitive damages in the absence of a showing of personal animus
or enmity.  See Savarese, 883 F.2d at 1204.  The Court will
accordingly deny the individual Defendants' motion for summary
judgment as to Plaintiff's claim for punitive damages.

### C.   Claims Asserted Against the City

Defendants argue, and the Court agrees, that the City is
entitled to summary judgment as to Plaintiff's claims against it.
It is well-settled that "[a] municipality cannot be responsible
for damages under section 1983 on a vicarious liability theory,
Monell v. Dept. of Soc. Servs., New York City, 436 U.S. 658,
694-95 (1978), and 'can be found liable under § 1983 only where
the municipality itself causes the constitutional violation at
issue.'  City of Canton v. Harris, 489 U.S. 378, 385 (1989)."

29

<u>Carswell v. Borough of Homestead</u>, 381 F.3d 235, 244 (3d Cir. 2004).  In order to demonstrate that the municipality is responsible for the constitutional violation, a plaintiff "must demonstrate that the [alleged] violation of his rights was caused by either a policy or a custom of the municipality." <u>Berg v. County of Allegheny</u>, 219 F.3d 261, 275 (citation omitted).

> Once a § 1983 plaintiff identifies a municipal policy or custom, he must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." <u>Board of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 404 (1997).  If, as here, the policy or custom does not facially violate federal law, causation can be established only by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.  A showing of simple or even heightened negligence will not suffice." <u>Id.</u> at 407 (citations omitted); <u>see</u> <u>also</u> <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 389 (1989).

<u>Id.</u> at 276.

Plaintiff argues that the City should be held liable for his injuries because it failed to train the Individual Defendants to recognize FBI credentials, and because it failed to implement policies that would have enabled police officers to identify undercover law enforcement agents more effectively.  As Plaintiff recognizes, in order to prevail under either of these theories, he would need to adduce evidence sufficient to establish that the municipality was deliberately indifferent to the likelihood that constitutional violations such as those that allegedly transpired in this case would occur.  <u>See</u>, <u>e.g.</u>, <u>id.</u>; <u>Woloszyn v. County of</u>

<u>Lawrence</u>, 396 F.3d 314, 324-25 (3d Cir. 2005); <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 637 (3d Cir. 1995).  As the Court of Appeals has repeatedly indicated, "[t]his typically requires proof of a pattern of underlying constitutional violations." <u>Carswell</u>, 381 F.3d at 244; <u>see also</u> <u>Berg</u>, 219 F.3d at 276.  Owing perhaps to the unique circumstances of this case, Plaintiff has adduced no evidence, such as previous complaints or incident reports, suggesting that such a pattern of constitutional violations existed here.

While under certain limited circumstances, a plaintiff can establish that the municipality was deliberately indifferent in the absence of such a pattern, both the Supreme Court and the Court of Appeals have emphasized that "the burden on the plaintiff in such a case is high."  <u>Berg</u>, 219 F.3d at 276.  As the Supreme Court explained in <u>Bryan County</u>:

> [I]n a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.  The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice.

<u>Board of County Com'rs of Bryan County v. Brown</u>, 520 U.S. 397, 408 (1997).  The Court gave an example of such a predictably recurring situation in <u>City of Canton</u>:

For example, city policymakers know to a moral certainty

31

>that their police officers will be required to arrest
>fleeing felons. The city has armed its officers with
>firearms, in part to allow them to accomplish this task.
>Thus, the need to train officers in the constitutional
>limitations on the use of deadly force can be said to
>be "so obvious," that failure to do so could properly be
>characterized as "deliberate indifference" to
>constitutional rights.

City of Canton, Ohio v. Harris, 489 U.S. 378, 390 n.10 (1989)

(citation omitted).

The circumstances in this case do not begin to approximate the predictably recurring scenarios discussed in Bryan County, City of Canton, and Berg. The suggestion that Wildwood's policymakers knew "to a moral certainty," id., that the City's police officers would frequently encounter undercover FBI agents, would be forced to make on-the-fly assessments of the validity of those agents' credentials in order to avoid violating the agents' constitutional rights, and that the frequency of such encounters would begin to approach the rate of recurrence of the fleeing felon example identified in City of Canton is unconvincing. Whereas circumstances testing the "constitutional limitations on the use of deadly force" are, as the Supreme Court recognized in City of Canton, inevitable – a fact demonstrated by the abundance of lawsuits filed over such matters – the unique nature of the circumstances at issue in this case is evidenced by Plaintiff's failure to identify a single lawsuit arising out of comparable circumstances. The outcome of the City's policies in this case may have been unfortunate for Mr. Frohner, but such an outcome

was not "highly predictable," "likel[y] . . . [to] recur," <u>Bryan County</u>, 520 U.S. at 408, or "'so obvious,' that failure to [prevent such outcomes] . . . could properly be characterized as 'deliberate indifference' to constitutional rights." <u>City of Canton</u>, 489 U.S. at 390 n.10.

The Court will accordingly grant the Defendants' motion for summary judgment as to Plaintiff's claims against the City.

**IV.   CONCLUSION**

For the reasons set forth above, the Court will grant Defendants' motion for summary judgment as to Plaintiff's claims asserted against the City, deny their motion for summary judgment as to Plaintiffs' claims asserted against the Individual Defendants, and deny Plaintiff's cross-motion for partial summary judgment.  The accompanying Order will be entered.

<u>**December 1, 2008**</u>                              <u> **s/ Jerome B. Simandle**      </u>
Date                                      JEROME B. SIMANDLE
                                          United States District Judge

33